OPINION OF THE COURT
Edward V. Mazur, J.
This is a postdivorce proceeding.
Petitioner and respondent were married on March 11, 1976 and divorced on September 2, 1980. Those portions of the judgment of divorce relative to custody of petitioner’s child, Jonathan Robert Robinson, now 17 years of age, who was adopted by respondent during the course of the marriage; and the economic aspects of the divorce were based upon a separation agreement entered into on July 24, 1980 and incorporated but not merged therein. According to respondent, this agreement was prepared by the person who was then counsel for petitioner, but, if this is fact, it is not yet in evidence and was not relied upon by the court in its decision herein.
Subsequent to the divorce, petitioner and Jonathan moved to Florida.
According to petitioner, Jonathan has been determined to have a "profound” learning disability, and to require certain psychological and emotional help and counseling. Her affidavit further states that, as a result, she sought treatment for Jonathan from, and paid for, 14 separate counseling sessions with one Richard A. White, LCSW, and has been forced to enroll Jonathan in the Phelps School, a private boarding school near Philadelphia, Pennsylvania, at a cost of some $10,000 per year.
She now alleges a right to 100% reimbursement, both of the cost of the counseling sessions with Mr. White and of the cost of Phelps, under paragraph 11 of the separation agreement, which, among other things, describes respondent’s responsibilities with regard to uninsured medical bills, and relative to Phelps only, paragraph 9 of the agreement pertaining to education, and seeks "enforcement”.
As a fall-back position, she asks the court to modify the judgment of divorce to require such reimbursement.
The first issue with which we must deal is one of enforcement, namely, whether respondent is responsible for the $440 paid to Mr. White and the cost of the Phelps School on the ground that they are medical expenses payable under para *666 graph 11. That paragraph reads as follows: "11. Medical Insurance. The Husband agrees that he will continue to carry medical insurance, including major medical coverage, substantially equivalent to that which he is presently carrying, in full force and effect for the benefit of the child, and for the benefit of the Wife as long as the parties remain married. The Husband further agrees to pay all reasonable and necessary medical expenses incurred on behalf of the child in excess of said coverage including all denture and orthodontia work.”
Respondent asserts that the cost of Mr. White and of the Phelps School are not medical expenses, and that he is not responsible for them.
Mr. White’s bills describe him as a "LCSW”, which presumably means licensed clinical social worker. Petitioner also describes him as "Social Worker”. According to his bills, Mr. White treated Jonathan for an "Oppositional Disorder 313.81”. The numbers refer to a listing of "disorders” in the Diagnostic and Statistical Manual of Mental Disorders (DSM III), an authoritative publication of the American Psychiatric Association. "Oppositional Disorder” is number 313.81 on the list. Its essential feature is "a pattern of disobedient, negativistic, and provocative opposition to authority figures; [t]he oppositional attitude is toward family members, particularly the parents, and toward teachers; [sjchool and family difficulties are common; [t]here may be use of illegal substances, such as cannabis” and "[i]t may cause serious academic problems if it includes refusal to learn”. Allegedly, experimentation with cannabis (marihuana) was a factor in Jonathan’s case.
Mr. White is alleged to have met with Jonathan and petitioner for what his bills describe as "family therapy” on some 14 occasions at $40 per session.
The Phelps School is a boarding school for boys grades seven through postgraduate, 22 miles west of Philadelphia, Pennsylvania. Apparently, its admission is not limited to those with learning problems, but, according to the pamphlet attached to petitioner’s affidavit of July 7, 1986 as exhibit H, it emphasizes individual attention and "is cognizant of the need for intensive remedial programming for those students achieving below their academic potential; Special Education is an integral part of the total school program providing instruction and services for students who require special classes; [t]hese individualized educational programs are remedial in substance with a strong tutorial component.” It also includes *667 a working farm, a "unique riding program”, and "an outstanding variety of weekend activities”. Its basic tuition is $9,850 per academic year. An additional fee of $400 per semester ($800 per academic year) is required "for a boy requiring more intensive and individualized instruction than the regular program provides”.
Petitioner asserts that Jonathan must go to Phelps, rather than the public schools in Manatee County, Florida, where he lives, because although of "above average intelligence”, and at least at the time of petitioner’s application to the court, getting passing grades as the result of a reward system set up by Mr. White, he has a "profound learning disorder”, as confirmed by a series of tests conducted by the school psychologist.
Both parties have submitted memorandums of law to aid the court in its decision. Unfortunately, there appears to be a real shortage of helpful precedent. In fact, neither party was able to offer a single New York case relative to whether or not language similar to that here in question applied to the cost of a psychologist, social worker, or private school.
There are decisions which say that the court has the authority in the context of the trial of a case in which there is no agreement by the parties to direct payment of the cost of psychological treatment for a child, even pendente lite, as in Monroe v Monroe (108 AD2d 793, 794, 795); or to mandate "continued payment” for a special school for a learning disabled child where his prior school has refused to enroll him, and to characterize attendance at such school as "a medical necessity”, as in Kosovich v Kosovich (82 AD2d 744); or to modify a judgment to require payment for psychotherapy and a specialized private school for hyperkinetic child with dyslexia and a minimal brain disfunction on the ground that it is "medically necessary”, as in Benson v Benson (79 AD2d 694). But these decisions are of little value with regard to the question now before us, because the courts in such cases are not being asked to interpret anything. They started with a clean slate. If they wished to use the term "medically necessary”, they could define that term in any way they wished. Where the issue is enforcement of a contract, be it a commercial contract or a separation agreement, the court is bound by its terms, and, so to speak, the custom in the industry relative to the meaning of the words used in it. For precedent to have meaning it must speak to this exact issue. Such cases are *668 woefully few, and, as stated from the court’s point of view, unsatisfactory.
Factually, the reported case which is closest to the one now before us is one decided not by the New York courts, but by the Court of Appeals of Arizona in 1975: Kahn v Kahn (23 Ariz App 269, 532 P2d 541). The separation agreement approved and ratified by the court in the final decree of divorce in that case contained the following provision: "The Husband agrees to pay for the cost of any unusual or extraordinary medical or dental expenses incurred for and on behalf of the minor children. The parties agree that any medical or dental expense of $100.00 or more per child shall be deemed to be an 'unusual or extraordinary medical or dental expense’ as the phrase is herein employed.” (Supra, at 272, at 541.) In 1970, the then nine-year-old child, Morton, was living in New York with his mother and her new husband. Because of the child’s apparent emotional problems the mother took him to see a clinical psychologist, Dr. Leah Levinger, Dr. Levinger recommended that the child see either a psychiatrist or a psychiatric social worker. The psychiatric social worker she recommended was Mrs. Clara Harari. The treatment with Mrs. Harari was for an extended period of time and included consultations with appellee and family consultations with appellant and her husband. The total amount of Mrs. Harari’s bill was $7,630, $530 of which was paid from a health and accident insurance policy required by the separation agreement to be maintained by appellee. The treatment by Mrs. Harari was deemed by the court to be reasonable and necessary. It was appellee’s position, however, that since Mrs. Harari was not a medical doctor, and since no medical doctor recommended Morton to her for treatment, the expenses incurred for Morton’s treatment were not "medical expenses” under the separation agreement. The court did not agree. It held that it was clear from the agreement that the parties intended that the husband be responsible for any health problems that might arise concerning the child.
The problem is that the court based this determination upon its earlier decision in a case called Beaugureau v Beaugureau (11 Ariz App 234, 463 P2d 540), in which it noted the broad meaning given to the term "medical expenses” when included in Arizona property settlement agreements. There is no Beaugureau in New York law. The New York practice is to take the wording of the agreement literally, as, for example, in Palyswiat v Palyswiat (84 AD2d 638).
*669 Palyswiat (supra) was an appeal from a Special Term order, which, inter alia, directed the husband to pay all medical necessities of the infant issue of the parties pursuant to a judgment of divorce which had its origin in a stipulation of the parties which was incorporated but not merged therein. The specific dispute arose over a bill of $84 which was incurred by the wife on behalf of one of her infant daughters for office visits with a pediatrician. The husband refused to pay, and the wife moved, by order to show cause, to have him held in contempt. Special Term held that the husband was required to pay. On appeal to the Third Department, the court held that: "the fundamental question presented for our determination is whether or not the court erred in construing * * * the divorce decree, and we conclude that it did. That provision of the decree provides that: 'the plaintiff shall provide for and maintain orthodontic, dental and ophtomology [sic] care and necessities for the issue of the marriage’. In our judgment, this quoted language, which had its origin in a stipulation of the parties and was incorporated but not merged in the divorce decree, is clear, precise and unambiguous and binds plaintiff to not pay for all of his daughters’ medical necessities as found by the court, but only for orthodontic, dental and ophthalmologic necessities. Had the parties or the court intended to hold plaintiff responsible for all of the medical necessities of the children, this could have been easily accomplished by a provision that plaintiff was to pay for all medical necessities including those relating to orthodontic, dental and ophthalmologic care.” (Supra, at 638.)
The only New York opinion interpreting the exact term used herein "medical expenses” as used in a separation agreement of which this court is aware is that of Family Court, Rensselaer County, in Matter of Noble v Noble (99 Misc 2d 498). In that case the agreement provided that the cost of "any routine non-insured medical expense” would be split between the parties. The wife incurred bills for allergy inoculations and dental expenses. The husband refused to pay, and the wife brought a proceeding to require such payment. The husband, of course, claimed that these were not medical expenses and that he was therefore under no obligations to contribute. The court held otherwise, saying:
"The professions, generally referred to as the healing arts, are included in title 8 of the Education Law which provides for the licensing and regulating of the professions. Included are medicine, physical therapy, physician’s and specialist’s *670 assistants, chiropractic, dentistry and dental hygiene, pharmacy, nursing, podiatry, optometry and ophthalmic dispensing.
"The cost of the services of any of these practitioners, in addition to a hospital and nursing home care, is a medical expense and the cost thereof, after the sharing of the cost of the deductible and coinsurance by the parties, shall be shared equally by the parties.” (Supra, at 499.)
This would certainly be a convenient rule of thumb. We note, however, that even though Education Law title VIII includes psychology (§ 7600 et seq.) and social work (§ 7700 et seq.) among the professions listed, even the Noble court (supra) did not include such services within its broad stroke definition. Moreover, we think a straight reliance on title VIII inappropriate for the purpose used. Not only does Education Law title VIII contain no definition of the term "healing arts”, it includes veterinary medicine (§ 6700 et seq.), engineering (§ 7200 et seq.), architecture (§ 7300), landscape architecture (§ 7320 et seq.), public accountancy (§ 7400 et seq.), and shorthand reporting (§ 7500 et seq.). More importantly, the pronouncement by the court that an agreement requiring the payment of uninsured medical expenses includes payment for dentistry flies in the face both of such cases as Palyswiat (supra) and of what this court observes to be the uniform practice of the bar in drafting separation and property settlement agreements, namely, to specifically mention dentistry where appropriate. The usual language requires the noncustodial parent to pay all uninsured "medical and dental expenses” (emphasis added) or a share thereof.
If petitioner’s counsel is somewhat contemptuous of respondent’s presentation of dictionary definitions of the term "medical” in his brief, he shouldn’t be. Although respondent is an attorney, separation agreements are generally written to serve as guides to future conduct for laymen. For this reason, the words employed in them should be given their natural, ordinary, and familiar meanings (Matter of Embirico, 184 Misc 453; Matter of Brown, 153 Misc 282).
The definitions offered by respondent are similar in their thrust to that found in Education Law title VIII, specifically in section 6521, which reads as follows: "The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition.”
*671 Under the statute, the practice of medicine is, by definition, engaged in by physicians (Education Law § 6522). Unless they are also licensed as physicians, the practice of medicine does not include dentists, who are governed by Education Law § 6600 et seq., psychologists, who are governed by Education Law § 7600 et seq., or social workers, who are governed by Education Law § 7700 et seq.
In the court’s experience, it is the practice of the Bar to make the same distinction in the drafting of separation agreements. Where, for example, dentistry is intended to be covered, it is, as aforesaid, specifically mentioned.
If the use of the term "medical expenses” without more is not deemed sufficient to give notice of an obligation to pay dental expenses, then how can it be said to give notice of an obligation to pay for a psychologist, or a social worker, or, heaven help us, tuition for one’s junior and senior years of high school at a costly boarding school?
In this case, the argument against inclusion may be particularly strong. Although the agreement was executed some eight months after La Scala v La Scala (73 AD2d 1068), in which the Appellate Division, Fourth Department, held that expenses for orthodonture would be included among those required to be paid under an agreement providing for the payment of "all extraordinary medical and dental expenses”, the parties still felt the need to specify that respondent would be responsible for the costs of denture and orthodontia work. (Emphasis added.)* To say, in light of such redundant specificity, that respondent’s agreement to this provision cast him into the morass of 100% liability for the cost of a social worker and a private boarding school, strikes the court as particularly inappropriate.
Petitioner’s argument is imaginative and academically interesting. Unfortunately, it cannot be sustained.
The court thus holds that the language of paragraph 11 of the agreement in the instant case, namely, that the husband will pay all insured "medical expenses * * * including all denture and orthodontia work”, does not require payment of either the White bills or the Phelps School.
Having so held, we further hold that petitioner can never *672 recover the $440 paid to Mr. White. Because this expense was incurred prior to the bringing of the motion, it is reimbursable on enforcement grounds, or not at all (cf, Benson v Benson, 79 AD2d 694, 695, supra).
We next come to the question of whether respondent can be held responsible for the entire cost of the Phelps School on enforcement grounds by virtue of paragraph 9 of the agreement. That paragraph reads as follows:
"9. Education. The Husband hereby acknowledges that it is his intention to provide the child with a college level education and to pay the costs incidental thereto consistent with his financial ability; but nothing herein shall be deemed to limit his absolute discretion in this regard.”
Petitioner argues that Jonathan has a learning disability, and that a college education will not be possible unless he can finish high school in a specialized setting, namely, the Phelps School and that the tuition for Phelps is therefore "incidental” to Jonathan’s achieving a college level education and 100% reimbursable by respondent.
Again there appear to be no cases directly on point. Frankel v Frankel (82 AD2d 796), cited by petitioner regarding responsibility for education expenses and private schools generally, was a trial case. Kaplan v Wallshein (57 AD2d 828) and Connolly v Connolly (83 AD2d 136), cited by petitioner for the same purpose, were modification cases. The court agrees that, like the language of the agreement in Connolly (supra) the language of paragraph 9 contemplates the possibility of a future need. But again, the words employed in this paragraph must be given their natural, ordinary and familiar meanings. (Matter of Embirico, supra; Matter of Brown, supra.) Once more the interpretation urged upon the court by petitioner, while imaginative and academically interesting, is, in the last analysis, strained.
The court therefore holds that in the phrase "the Husband hereby acknowledges that it is his intention to provide the child with a college level education and to pay the costs incidental thereto”, the words "costs incidental thereto” refer back to the words "college level education”, meaning the cost of college. The phrase does not read "the Husband hereby acknowledges that it is his intention to provide the child with a college level education and such specialized schooling as may be necessary to qualify him for admission”, and the court will not read those words into it. It will also not read out the *673 last phrase of the paragraph: "but nothing herein shall be deemed to limit his absolute discretion in this regard”. Absolute discretion means absolute discretion. Paragraph 9, while more than mere "fluff”, is therefore precatory in nature. Legally, the situation before the court is that the agreement provides for support for the child without including any direction relative to college whatsoever. For these reasons, petitioner cannot obtain payment from respondent for the Phelps School as a matter of enforcement under paragraph 9 either.
This brings us to the question of whether or not petitioner can obtain a modification of the judgment of divorce so as to require respondent to pay all or a part of the tuition for Phelps, including that paid by petitioner after the commencement of this proceeding, and future counseling expenses.
Petitioner has wisely asserted a right to do so on the grounds that the development or discovery of the seriousness of Jonathan’s problems constitutes an unanticipated and unreasonable change of circumstances so as to justify a change in the allocation of the parties’ responsibility for support (Matter of Boden v Boden, 42 NY2d 210); and, in the alternative, on the ground that the referenced counseling and attendance at Phelps are legitimate needs which cannot be met out of her present resources (Matter of Brescia v Fitts, 56 NY2d 132).
At argument, respondent cited Rubin v Rubin (119 AD2d 152) for the apparent proposition that the Brescia rule (supra) had somehow been eliminated or watered down. This is simply not the case. What the court in Rubin said was that the facts before it did not fit Brescia and that for this reason Boden (supra) applied. In so doing, it quoted Brescia’s description of the facts in Boden as follows: " 'In seeking increased child support from the father, the mother was not asserting the right of the child to be supported by the father, as the child’s needs could clearly have been met by either parent, given their respective financial situations. Rather, the mother was asserting her own interest in having the father contribute more to the financial burden of raising the child. Thus, the principles set forth in Boden apply only when the dispute is directed solely to readjusting the respective obligations of the parents to support their child’ ” (119 AD2d, at 155).
It then turned to the facts in the case before it: "Here * * * [t]here is no assertion that the child’s needs are not being *674 adequately met * * * The child’s needs can clearly be met by either party. Thus, this action falls squarely within Brescia’s definition of the Boden principle, viz., it is the mother’s interest in having a greater financial contribution from the father that is involved, not the needs of the child.” (At 155.)
The court also disagrees with the insinuation in respondent’s brief that for Brescia (supra) to apply, there must be a showing of "a material negative change in circumstances” or that relief is precluded where the custodial parent’s "financial circumstances have improved extravagantly”. The proper focus in a Brescia case is not on any change in the circumstances of the parent, but on the needs of the child and whether they can be met without the required modification. That petitioner’s income has increased does not, by itself, answer the question.
The court is also satisfied that common sense and existing case law provide adequate authority for the proposition that the services of a psychologist, or social worker, or even attendance at a private school could, under the proper circumstances, be considered legitimate needs of the child, and hence elements of support, and that if the requirements of Boden (supra) or Brescia (supra) are met, it could order respondent to make some contribution to their cost (Monroe v Monroe, supra; Connolly v Connolly, supra; Kosovich v Kosovich, supra; Benson v Benson, supra).
Respondent naturally denies the allegations made by petitioner, makes certain allegations of his own, and seeks a dismissal as a matter of law. However, the court is of the opinion that in light of the above cases, and after reviewing the papers, such denials and positive assertions merely create issues of fact, and that petitioner’s papers are not so clearly deficient as to justify a deviation from the usual rule that the existence of such issues requires a hearing.
That hearing shall be held on Wednesday, May 6, 1987, at 9:30 in the morning in Part 2 of Family Court, unless otherwise agreed upon, or adjourned at the convenience of the court.
At that hearing, the court will be particularly interested in the following issues:
1. The extent to which Jonathan’s problems were known on July 24, 1980, when the agreement which formed the basis of the financial aspects of the judgment of divorce was entered into. To this end, the court would like to have all of Jona *675 than’s school and other records up to that time properly admitted into evidence.
2. The extent of Jonathan’s problems now. In that regard the court reminds the petitioner that the documents annexed to her affidavit of July 7, 1986, are not before it as proof of the matters therein stated merely because they are so attached, and that the information therein will not be admitted into evidence except in compliance with the usual rules thereof.
3. What other alternatives than the Phelps School were considered or available, especially those in Jonathan’s home district, the cost of each, and why Phelps was selected instead (see, Baiamonte v Baiamonte, 67 AD2d 992).
4. Why Jonathan’s home district should not be responsible for whatever special education he needs (see, Penal Law § 94-142, the Education for All Handicapped Children Act [20 USC § 1400 et seq.J).
5. The extent to which petitioner would be able to meet Jonathan’s expenses without the requested modification. To this end, the court would like to have complete and objective evidence of her assets, earnings and expenses, including for 1986, which evidence should, by now, be in her possession.
6. The extent to which respondent would be able to contribute if so ordered. The court finds that support, and hence respondent’s income, are in issue in this case (Boden v Boden, supra; Brescia v Fitts, supra). Respondent’s CPLR 2304 motion to quash the subpoena issued by petitioner’s counsel is therefore denied; however, that section permits the court to impose reasonable conditions upon the granting or denial of such motion, and the court shall do so. Those conditions are that the materials provided be through 1986; that respondent furnish petitioner’s counsel with a list of items to be provided within 20 days of the order to follow this decision; that if a dispute arises as to whether or not the response described in such list is adequate, the parties shall inform the court and the matter will be resolved by informal conference or by motion, as the parties shall desire, by taking account of the fact that the court strongly prefers the informal method; that the actual items to be provided shall be made available to petitioner’s counsel for review no later than 15 days before the date of the hearing; that any deposition of respondent relative to such items be conducted no earlier than 15 days before such hearing; and that if respondent wants to subpoena certain of petitioner’s records, he shall do so on or before the *676 date of his delivery of the aforesaid list and that all of the conditions hereby imposed upon petitioner shall thereafter be imposed upon him relative to his subpoena as well.
7. Why respondent’s obligation for ordinary support should not be suspended while Jonathan is in residence at Phelps (cf., Nehorayoff v Nehorayoff, 108 Misc 2d 311, 324), or, in the alternative, why such amount should not be taken as a setoff against the cost of such school, or considered relative to petitioner’s means.
8. The matter of counsel fees (Entwistle v Entwistle, 92 AD2d 879).
In the event that a modification is granted, the court will allocate the cost of the items in question between the parties according to their respective means (Benson v Benson, supra, at 695). It will not be constrained to direct full payment by respondent as would be the case if relief was granted on enforcement grounds.
Finally, since this proceeding is, in essence, one for increased child support, counsel fees will be granted only in the event petitioner is unable to pay (Rubin v Rubin, 119 AD2d 152, supra; Kann v Kann, 38 AD2d 545); and not at all if the proceeding brought by petitioner is determined to be frivolous (Salk v Salk, 57 AD2d 519).

 La Scala v La Scala (73 AD2d 1068) does not require a different conclusion from the one now reached by us, because orthodonture is merely a speciality of dentistry, the same as neurology is a speciality included within the definition of the practice of medicine.